ENGEL, Circuit Judge.
This appeal raises difficult issues concerning the complex state and federal statutory and regulatory schemes involved in the delivery of Medicaid services to eligible patients. While the original problems were of an accounting nature, they have been rendered far more difficult by the complexity and uncertainty of the rules which are intended to resolve them and by the further circumstance that they arose in the course of bankruptcy proceedings.
In July, 1978, appellee Phil Collins commenced proceedings in the Bankruptcy[1] Court for the Southern District of Ohio, Western Division, for an arrangement under Chapter XI of the Bankruptcy Act of 1898, as amended, 11 U.S.C. 701 et seq. (1976) (repealed 1979), as sole owner of four nursing homes in Ohio and as owner in partnership with his wife of two other homes.
Shortly after the proceedings were filed, the State of Ohio filed two proofs of claim with the bankruptcy court against the bankruptcy estate totaling $280,387.88, covering 1973 to 1975. During the trial, the state amended its proofs of claim and reduced the amount to $239,934.60, representing alleged overpayments made by Ohio to Collins as a provider under the federal-state Medicaid program between January 1, 1973 and December 31, 1977. Collins, as debtor in possession, filed his objection to the allowance of the claims and also a counterclaim seeking $519,290.32 from the state based upon failure of the Ohio Department of Public Welfare (“ODPW”) (the Ohio state agency administering Medicaid)[1] to make allowance for owner’s compensation, depreciation and return of owner’s equity, and the improper use of a prospective reimbursement formula for 1976 and 1977. After a five day trial, the bankruptcy judge disallowed Ohio’s proof of claim but refused to enter a judgment against the state on Collins’ counterclaim. The district court affirmed, and this appeal by Ohio followed.
I.
To obtain reimbursement for services performed and expenses incurred for Medicaid patients, Collins filed cost reports with ODPW for the years involved in this appeal, and these reports were later audited by ODPW.
The state’s original claim was based upon a November, 1977 audit of Collins’ books, records and cost reports. During the bankruptcy trial, however, this audit was largely discredited. Instead, reliance was placed on a second audit that had occurred in the summer of 1978. Both audits showed that Collins had filed false cost reports with inflated figures. In January and February of 1978, Ohio began procedures to terminate Collins’ status as a Medicaid provider. Ohio then attempted in July 1978 to recover the claimed overpayments through a garnishment proceeding brought in state court. Following this, Collins sought the refuge of Chapter XI proceedings on July 21, 1978.
Meanwhile, the federal government commenced criminal proceedings against Collins, resulting in his conviction of seven counts of mail fraud in violation of 18 U.S.C. § 1341 (1976). His conviction and sentence to four months imprisonment and a $7,000 fine were affirmed by this court in United States v. Collins, 596 F.2d 166 (6th Cir.1979) (per curiam). Each count of the indictment related to alleged fraudulent and inflated cost reports submitted by mail to Ohio with respect to the defendant’s seven nursing homes.[2] Collins had filed the cost reports in connection with his efforts to obtain Medicaid reimbursement during 1973. As will be discussed, Ohio’s resulting and justifiable distrust of Collins has been a major block to any sensible resolution of the disputes which arose later.
*435 Although the record clearly shows the frustration of the bankruptcy judge resulting from the state’s poorly organized presentation of its claim, a modicum of agreement was reached between the parties and the court concerning the accounting for 1973,1974 and 1975. At least tacitly it was agreed that the second ODPW audit was substantially correct, as a matter of bookkeeping. Although only the 1973 cost reports had been the subject of criminal proceedings, it was evident that similarly inflated costs had been submitted for the years 1974 and 1975. The second audit essentially determined what the correct figures were and recomputed the amount of reimbursement to which Collins had been entitled. In its amended proof of claim, Ohio asserted a claim for the difference between what was actually paid to Collins and the lesser amount that should have been paid according to figures from the 1978 audit.
Differences, however, remained between Ohio and Collins. For 1973-75, Collins contended that ODPW had improperly denied him owner’s compensation, return on owner’s equity, and depreciation.[3] Ohio responded that Collins had not complied with the requirements to recover owner’s compensation and that he had received the other payments to the extent required by state and federal law. With regard to 1976, Ohio applied a prospective reimbursement system to the 1978 audit, with the result that Collins owed the state over $50,000.00. Collins, on the other hand, contended that a retrospective system, as had been used for 1973-75, should be applied to the audit figures. Under Collins’ approach, the state owed him over $150,000.00.
After trial in the bankruptcy court, the bankruptcy judge entered an order which disallowed Ohio’s proofs of claim for 1973-76 because the amount which Collins was owed exceeded any amount which was claimed by the State of Ohio. In re: Madeline Marie Nursing Homes, Nos. B-1-78-1029/1030, mem. dec. and order (Bankr.S.D. Ohio July 17, 1979). The bankruptcy judge made the following factual findings: Collins owed Ohio $23,554.72 due to overpayments caused by inflated cost reports in 1973-75; Ohio owed Collins $141,824.25 under the retrospective reimbursement in 1976; and Ohio owed Collins $40,000.00 per year for 1973-75 for owner’s compensation. Because this more than eliminated Ohio’s claim, the judge made no finding as to owner’s equity or depreciation. At the same time, he declined to render any affirmative judgment against Ohio upon the concession of the debtor that the bankruptcy court was without the power to do so under the doctrine of sovereign immunity as embodied in the Eleventh Amendment.[4] The bankruptcy judge declined to rule on amounts in dispute for 1977 until an audit had been completed, and the dispute for that year is not before us. Upon appeal by Ohio to the United States District Court, a judgment was entered upholding the decision of the bankruptcy court in all particulars, on the otherwise unarticulated bases that there were no errors of law and that the factual findings of the bankruptcy judge were not clearly erroneous but were supported by substantial evidence. Ohio v. Collins, No. C-1-80-59, order (S.D.Ohio July 3, 1980).
A complete examination of the transcript of the proceedings in the bankruptcy court has been made. To characterize that record as confusing is an understatement. It must be acknowledged at the outset that most of the blame lies with the State of Ohio for *436 failing to comply in good faith and in a timely manner with appropriate discovery sought by Collins, for failing to comply with the pretrial requirements for listing of witnesses who were to testify and, most important, for failing to present to the court, in good lawyerlike fashion, a clear and appropriately documented and referenced explanation of Ohio’s participating role in the federal Medicaid program. The state’s brief filed in this court, containing only 16 pages, is similarly unhelpful. Under such circumstances, we would normally be strongly inclined to affirm on the simple basis that the state had failed to carry its burden of proving its claim or, put otherwise, that in being denied relief the state merely got what it deserved as a result of its own neglect. Other considerations, among them a proper respect for the dignity of the State of Ohio and a need to bring some semblance of order to the confused record, preclude us from taking this infinitely easier path.
In its appeal to this court, while not expressly challenging any findings of fact made by the bankruptcy court,[5] Ohio asserts that two errors of law were made which require reversal: (1) the bankruptcy court failed to apply the prospective method of reimbursement set forth in the state and federal Medicaid statutes and regulations for 1976, and (2) the bankruptcy court disregarded state and federal Medicaid laws and regulations regarding owner’s compensation.
Because of the insufficiency of the findings of the bankruptcy court and because of uncertainty over the correctness of its application of the law, we reverse and remand with instructions.
II.
In both legal issues before this court Ohio challenges the bankruptcy court’s failure to apply Ohio Medicaid regulations. As an initial matter, we must consider the bankruptcy court’s choice of the appropriate law to be applied to Ohio’s claim and Collins’ counterclaim. Collins argues that the bankruptcy judge was not bound to apply state and federal Medicaid law; instead, Collins states that the bankruptcy court, as a court of equity, could refuse to apply the otherwise correct law “in exercising its equitable power to achieve a just result in this case.” Appellee’s Brief at 17. We do not believe, however, that the bankruptcy judge’s equitable powers justify his failure initially to determine and apply the underlying law from which the obligations of Ohio and Collins arose.
While Ohio’s claim against the estate of the bankrupt sought reimbursement of monies allegedly paid by the State of Ohio in reliance upon erroneous or fraudulently submitted information, it is nonetheless true that by its nature the suit is one for an accounting, which has historically been equitable in nature. See generally Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). It is also true that, both conceptually and in the precise language of the Bankruptcy Act of 1898, “courts of the United States hereinbefore defined as courts of bankruptcy ... are hereby invested ... with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this Act.... ” 11 U.S.C. § 11 (1976) (repealed 1979). As courts of equity, bankruptcy courts “will look through the form to the substance of any particular transaction and may contrive new remedies where-those in law are inadequate. Where the Bankruptcy Act is silent, equitable principles will govern.” 1 Collier on Bankruptcy, 12.09 at 173-175 (14th ed. 1974) (footnotes omitted).
Case law has further established that the bankruptcy courts, as courts of the United States, have power to supercede state law *437 where it conflicts with the federal bankruptcy law which the court is primarily bound to enforce. In Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), the Supreme Court stated:
In determining what claims are allowable and how a debtor’s assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. Erie R.R. v. Tompkins, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188], has no such implication .... [Bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims should be allowed under equitable principles.
329 U.S. at 162-63, 67 S.Ct. at 240 (footnote omitted). Before Vanston, Justice Douglas had observed in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939):
The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.
308 U.S. at 304-05, 60 S.Ct. at 244 (emphasis added) (footnote omitted).
While the language in Vanston and Pepper is far-reaching, it is not unlimited. Under the Bankruptcy Act of 1898, there are three distinct steps required to establish a claim. First, there must be a determination of the existence and amount of the liability based upon the prebankruptcy claim. Second, the claim must be “proved” in bankruptcy according to section 63 of the Act, 11 U.S.C. § 103 (1976) (repealed 1979). Third, if the claim is proved, the bankruptcy court must determine the claim’s allowability under section 57 of the Act, 11 U.S.C. § 93 (1976) (repealed 1979). See Countryman, The Use of State Law in Bankruptcy Cases (Part 1), 47 N.Y.U.L.Rev. 407, 426 (1972).
Vanston and Pepper fall within limitations on bankruptcy claims termed the “Deep Rock doctrine” and “equitable subordination.”[6] Under these doctrines, bankruptcy courts applied equitable principles to determine what claims would be allowed under the Act and their priority. See Hill, The Erie Doctrine in Bankruptcy, 66 Harv. L.Rev. 1013, 1017 (1955). These doctrines have never been applied, however, to oust state law in the original determination of the existence and amount of liability.
This distinction is illustrated in Vanston. Bondholders in that case claimed not only interest according to terms of the bonds but also interest that had accrued on the unpaid interest since the filing in bankruptcy, even though other creditors in the bankrupt’s estate may not have had a contract right to the same consideration with respect to their claims. The bankruptcy court allowed the claim because the interest on interest, though accruing after bankruptcy, was in accordance with the agreement prior thereto. Our court reversed, In re: American *438 Fuel and Power, 151 F.2d 470 (6th Cir.1945), because New York law considered such interest on interest clauses to be invalid. The Supreme Court affirmed, but not on that ground. It held instead that, regardless of New York law, interest should not be paid on interest because this “would not be in accord with the equitable principles governing bankruptcy distributions.” Vanston Bondholders Protective Comm. v. Green, supra, 329 U.S. at 163, 67 S.Ct. at 240. Assuming the interest claim to be valid under New York law, the Supreme Court reasoned that the bondholders’ claim would be allowed only after balancing the equities between creditors and debtors since the claim was for monies due after the filing of the petition in bankruptcy. Upon making this balance the Court concluded that the claim could not be allowed.
The Supreme Court in Vanston deliberately declined to apply any notions of a general federal law to hold that the interest on interest claim was invalid. Further, it recognized that “[w]hat claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.” 329 U.S. at 161, 67 S.Ct. at 239 (footnote omitted). Justice Frankfurter, concurring in the judgment, illuminated this principle as follows:
Parties are in a bankruptcy court with their rights and duties already established, except insofar as they subsequently arise during the course of bankruptcy administration or as part of its conduct. Obligations to be satisfied out of the bankrupt’s estate thus arise, if at all, out of tort or contract or other relationship created under applicable law. And the law that fixes legal consequences to transactions is the law of the several States. Except for the very limited obligations created by Congress, a debt is not brought into being by federal law. Obligations exist or do not exist by force of state law though federal bankruptcy legislation is in force, just as State law determined whether they came into being or did not come into being between 1878 and 1898 when there was no bankruptcy law.... Of course a State may affix to a transaction an obligation which the courts of other States or the federal courts need not enforce because of overriding considerations of policy. And so, in the proper adjustment of the rights of creditors and the desire to rehabilitate the debtor, Congress under its bankruptcy power may authorize its courts to refuse to allow existing debts to be proven.... But the threshold question for the allowance of a claim is whether a claim exists. And clarity of analysis justifies repetition that except where federal law, wholly apart from bankruptcy, has created obligations by the exercise of power granted to the federal government, a claim implies the existence of an obligation created by State law.
329 U.S. at 169-70, 67 S.Ct. at 243 (emphasis added) (citation omitted).
Justice Frankfurter’s concurring language, which is not inconsistent with any holding of the majority in Vanston, also supports the general proposition stated by Justice Stevens writing for the Court in Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979):
Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interest by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving “a windfall merely by reason of the happenstance of bankruptcy.” The justifications for application of state law are not limited to ownership interests, they apply with equal force to security interests, including the interest of a mortgage in rents earned by mortgaged property.
440 U.S. at 55, 99 S.Ct. at 918 (citation and footnote omitted). In a number of other *439 settings the Supreme Court has looked to the underlying state law before application of bankruptcy principles. See Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) (per curiam) (whether a constructive trust had been created by bankrupt’s fraud); Security Mortgage Co. v. Powers, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236 (1928) (validity of lien on real estate); Harrigan v. Bergdoll, 270 U.S. 560, 46 S.Ct. 413, 70 L.Ed. 733 (1926) (liability of shareholders to bankrupt on account of unpaid stock); Bryant v. Swifford Bros. Dry Goods Co., 214 U.S. 279, 29 S.Ct. 614, 53 L.Ed. 997 (1909) (existence of a conditional sales contract between bankrupt and one of its suppliers).
Cases in this circuit have established that local law should be consulted to determine the validity of a third party’s equity in property held by the bankruptcy trustee. See In re Clemens, 472 F.2d 939 (6th Cir. 1972); In re Easy Living, 407 F.2d 142 (6th Cir.1969); Hertzberg v. Assocs. Discount Corp., 272 F.2d 6 (6th Cir.1959), cert. denied, 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868 (1960); cf. Bayview Estates, Inc. v. Bayview Estates Mobile Home Owners Ass’n, 508 F.2d 405 (6th Cir.1974) (looking to local law to determine whether funds were held in escrow for benefit of bankrupt). As in Butner v. United States, the cited Sixth Circuit decisions deal with rights in property. We believe, however, that the underlying principle of those cases — that state law should generally be used to decide issues regarding property interests — applies equally to contract cases, which would be governed by state law absent the bankruptcy.[7]
It therefore follows with even greater force that where the claim is based not only upon state law, but upon a proper application of state and federal law in pursuance of a well enunciated federal policy, respect should be given to the prebankruptcy statutory and regulatory scheme. It is the failure of the bankruptcy judge to accord due respect to the Medicaid scheme which primarily occasions our reversal of the judgment below.
III.
With regard to the first issue raised by Ohio — the method of Medicaid reimbursement for nursing homes in Ohio in 1976— Ohio basically argued in the bankruptcy court that the amount Collins had a right to receive in 1976 was dependent upon his 1974 costs, with adjustment for inflation. This was termed the “prospective” system. Collins contended that the bankruptcy court should use his 1976 actual costs to calculate the amount of reimbursement for 1976. This was the system employed by ODPW in 1973-75 and was termed the “retrospective” system.
Without any analysis and without any evident effort to understand the prospective reimbursement scheme which Ohio argues was in effect in 1976, the bankruptcy court rejected the concept outright and instead substituted his own standard for determining the appropriate reimbursement scheme for 1976:
One last comment. It has been urged on this Court by eminent counsel for the State of Ohio that in considering the claims of the State of Ohio, this Court is bound by procedures and “plans” in effect by the Department of Public Welfare of the State of Ohio at the time of the happenings. This advocacy certainly is *440 applicable if the procedures are utilized for the purpose for which they were intended and are intelligible and understandable. From what this Court has been able to gather from the testimony surrounding the “prospective” reimbursement the State of Ohio was attempting to promulgate, there was mass confusion, meaningless seminars, and no meeting of the minds among any of the participants. No “prospective” fictitious audit can establish an ‘actuality’ between two persons. The only common sense and judicial method of establishing the status quo is by auditing the books and records on the one side, and determining the reimbursable items of cost on the other. The Bankruptcy Court seeks truth not projection in establishing claims of creditors.
Lest we appear too harsh on the bankruptcy court, we hasten to acknowledge the utter complexity of the subject matter with which it was dealing. As the Supreme Court observed in Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981): “The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction, as Judge Friendly has observed, makes the Act ‘almost unintelligible to the uninitiated.’ ” Of like purport is the comment of Chief Justice Burger, dissenting in Herweg v. Ray, 455 U.S. 265, 279, 102 S.Ct. 1059, 1068, 71 L.Ed.2d 137 (1982): “the Medicaid program is a morass of bureaucratic complexity .... ” One district judge has gone so far as to observe that “[t]he Medicaid statute ... is an aggravated assault on the English language, resistant to attempts to understand it. The statute is complicated and murky, not only difficult to administer and to interpret but a poor example to those who would like to use plain and simple expressions.” Friedman v. Berger, 409 F.Supp. 1225-26 (S.D.N.Y.1976).
What is true of the federal statutory scheme is, from our observation, equally true of Ohio’s changing law governing its participation in the Medicaid program. The absence of any finding and interpretation by the bankruptcy or district judge, the paucity of authoritative citations in the state’s brief, the inadequacies of the record before the bankruptcy judge, the lack of an official compilation of Ohio’s administrative regulations for 1976 and the bankruptcy judge’s rejection of efforts by the State of Ohio to clarify the nature of the joint federal-state statutory scheme all frustrate our ability here to apply ordinary concepts of judicial notice of state and federal law to resolve the dispute between the parties.
As will be discussed later, the failure of the bankruptcy judge to avail himself of testimony of experts from ODPW or to make any independent effort to analyze the Ohio regulatory scheme during the relevant period rendered it impossible for the court to reach an appropriate decision with respect to Ohio’s claim for the year 1976. It also frustrates our own ability to review the correctness of any determination made concerning it. We may, however, make some basic observations concerning Medicaid and Ohio’s regulatory scheme under which it is administered, so that the issue of what reimbursement system was employed in 1976 is sharpened on this appeal and on remand for further evidence.
The Medicaid program was created by Title XIX of the Social Security Act, as amended, 42 U.S.C. § 1396 et seq. It was described by the Supreme Court in Harris v. McRae, 448 U.S. 297, 308, 100 S.Ct. 2671, 2683-2684, 65 L.Ed.2d 784 (1980) as:
a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of “cooperative federalism,” if a State agrees to establish a Medicaid plan that satisfies the requirement of Title XIX ... the Federal Government agrees to pay a specified percentage of “the total amount expended ... as medical assistance under the State plan.... ” The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State.
(citations omitted).
Federal regulations in effect for 1976 required that those states desiring to partici *441 pate in Medicaid submit a state plan for medical assistance which must “[pjrovide for payment of the reasonable cost of inpatient hospital services . .. which [plan] shall be developed by the State and approved in advance of implementation by the Regional Commissioner.” 45 C.F.R. § 250.30(a)(2) (1976). The cited regulation stems from the provision of Title XIX that “[t]he sums made available under this section shall be used for making payment to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance.” 42 U.S.C. § 1396 (1976). Title XIX also requires the state plans to “provide for agreements with every person or institution providing services under the State plan....” 42 U.S.C. § 1396a(a)(27) (1976). Thus, the rights and obligations of a provider of nursing home services under Medicaid arise primarily from the state plan and the provider agreement. See Ohio v. Collins, 694 F.2d 449 at 456 (6th Cir.1982); Green v. Cashman, 605 F.2d 945, 946 (6th Cir.1979).[8]
Under earlier Medicaid plans submitted by Ohio and approved by the government, various formulae for determination of the provider’s entitlement to reimbursement had been adopted. Before 1973, Medicaid providers in Ohio, such as Collins, were reimbursed on a flat fee, per diem basis. Under this method, the provider received a set amount regardless of costs; thus, actual costs did not need to be reported. In 1973, however, Ohio went to a system of “cost reporting.” Testimony at trial indicated that the implementation of this procedure caused great confusion among nursing home owners. Under the new cost reporting system, the provider’s initial expenses were estimated on the basis of experience in prior years. At the end of a given year, an audit was to be undertaken, and actual reasonable costs incurred in the nursing home were balanced against the estimated amounts' previously received. Thereafter, as necessary, the provider and the state would make a settlement so that the reasonable costs incurred were equal to the amount received, and the accounts of the parties were debited or credited as needed. Because these adjustments were made at the end of the year based on actual costs which had already been incurred, this system of reimbursement was called the “retrospective” system. *
In 1975, according to Ohio, ODPW attempted to change the system of reimbursement. Under the new system a per diem rate of reimbursement was to be determined, based upon the actual costs incurred by the nursing home facility two years earlier. ODPW adjusted the per diem rate for inflation and other factors which might be determined necessary to conform the reimbursement rate to the anticipated reasonable costs to be incurred. As adjusted, the rate imposed was intended to be the final rate at which the nursing home would be reimbursed without subsequent adjustment based upon actual costs. Using actual costs to set rates two years in the future, this procedure was termed a “prospective” reimbursement system.
During the bankruptcy trial, it became clear that the issue of the type of reimbursement system to be applied for 1976 was critical to the parties. Under the prospective system for reimbursement, Ohio claimed that it had overpaid Collins a total of $141,824.46 for Medicaid expenses in 1976, whereas it was Collins’ claim that under the retrospective system he would have been owed by the State of Ohio an excess of $50,000.00. Consistently throughout the hearing, however, the bankruptcy judge declined to recognize or understand any claim for reimbursement based upon a *442 prospective rate. He was apparently convinced that any system which did not call for an ultimate reimbursement of all actual costs was inequitable and perforce invalid. We respectfully disagree.
It appears that federal regulations during 1976 contemplated that a state could adopt, and the federal government would approve, plans for payment on a prospective basis. The regulations in effect during the first half of 1976 set up two standards by which a state’s plan could qualify under the Medicaid statute. Under 45 C.F.R. § 250.-30(a)(2)(i) (1976), a state plan would be approved if it adopted the Medicare standards under Title XVIII or, alternatively, if it met five criteria set forth in 45 C.F.R. § 250.30(a)(2)(ii)(a)-(e) (1976). The second criterion required that the State plan provide “[reimbursement on a reasonable cost basis." 45 C.F.R. § 250.30(a)(2)(ii)(b) (1976).[9] Effective July 1, 1976, the regulations required the State plan provide payment to nursing homes on a “reasonable cost-related basis.” 45 C.F.R. § 250.30(a)(3) (1976). Among the standards for a reasonable cost-related basis, the State plan had to provide that:
[p]ayment rates shall not be set lower than the level which the State reasonably finds, or in the case of a prospectively determined rate, the level which the State reasonably expects, to be adequate to reimburse in full such actual allowable costs of a facility that is economically and efficiently operated.
45 C.F.R. § 250.30(a)(3)(iv)(A) (1976). The Department of Health, Education and Welfare (“HEW”) issued a proposed definition of a prospective payment system at 43 Fed. Reg. 4861 (Feb. 6, 1978) and 44 Fed.Reg. 23098 (April 18, 1979), but we have found no record of an official promulgation. Nonetheless, we believe in principle a prospective reimbursement could have been found by the Secretary of HEW to conform with the Medicaid Act and its regulations for 1976.
As long as the reimbursement methods comply with federal Medicaid statutes and regulations, the participating states have latitude to make a policy decision regarding which method best suits their needs. Over the years, the State of Ohio has had in operation or under consideration at least three different reimbursement systems. Each has its advantages and disadvantages. Ohio could have viewed its flat fee structure as insensitive to ever-changing standards set by the state and federal government in providing Medicaid services and inadequate to take into account rapidly rising and unanticipated inflationary increases in the costs of services. The retrospective plan, commencing in 1973, may have been designed to alleviate those problems. Because reimbursement under the retrospective system was based upon actual expenses incurred, however, the system could create a strong tendency to inflate costs and indeed little incentive to keep them down.[10]
Undoubtedly, it was a concern over increasing costs and even, perhaps, with the abuses demonstrated in the criminal proceedings against Collins himself, that induced Ohio to proceed to a prospective reimbursement system. The purpose of such a prospective system would be threefold:
*443 (a) to allow the provider and the state to arrive at a reasonable price for the services rendered based upon finally audited and therefore more reliably established experiences for the same institution; (b) to allow both the state and the provider to know in advance their budgetary requirements; and (c) to eliminate the inherent disadvantages of a “cost plus” system with its tendency of encouraging inefficiency and injecting uncertainty in the provider who must wait to find out whether his expenditures for services might later be deemed unreasonable and, thus, unreimbursable.
We observe that it is not for us, nor was it for the bankruptcy court, to determine what particular scheme was to be preferred. This is left in the first instance to the state, acting in compliance with its own rules and regulations and with the requirements of Title XIX. It was error for the bankruptcy judge to conclude without analysis or reason that such a system was inherently unlawful or inequitable. It does not automatically follow that a prospective system if otherwise reasonable was rendered less so because payments under it did not unerringly match the actual costs incurred by the provider.
A similar prospective reimbursement system in effect under Massachusetts’ Medicaid plan was challenged in Massachusetts General Hospital v. Weiner, 569 F.2d 1156 (1st Cir.1978), although Massachusetts’ plan had been submitted to and approved by HEW. The hospital argued that the formula did not reimburse it for actual costs as, it asserted, was required by federal statute. Thus, the hospital contended that the prospective system violated Title XIX. The First Circuit held that Title XIX did not mandate reimbursement on an “actual cost” basis. We agree with that court’s observation:
As observed by the district court, the legal issue is not whether the complex Plan is perfect, but whether under the Federal system of reimbursement, which has among its objectives the valid goal of providing incentives for efficiency and economy, the Plan can be said to provide for “payment of the reasonable cost of inpatient hospital services.” The answer lies not in an assessment of policy, for that is the function of the state and Federal agencies, but in an analysis of the record presented to these agencies in light of the statutory and constitutional requirements. We conclude, as did the district court, that neither the language of the statute ánd regulations nor the evidence presented below supports appellant’s contention in this case.
The hospital contends that Congress intended “reasonable costs” of inpatient hospital services under Medicaid to mean full payment of the actual cost thereof. If Congress had intended “reasonable costs” to be synonymous with “actual costs”, however, there would have been no reason for the amendments as promulgated by Public Law 92-603, 42 U.S.C. § 1396a(a)(13)(D), to provide for the “reasonable cost” program.
Id. at 1158-59.
Although we generally agree with the decision of the First Circuit in Massachusetts General, we cannot hold on the present record that Ohio’s reimbursement system complied with federal or state requirements. The record from the bankruptcy court does not contain sufficient evidence for us to discern precisely what plan was lawfully adopted during 1976 or how it was administered by ODPW. Although in this opinion we have given a tentative description of Ohio’s prospective system, this is not intended to be a final disposition of the question or to be the end of the inquiry on remand. Our description is based in part on evidence not admitted at trial and on descriptions of similar proscriptive systems from other states.
While it might be possible for us at this level to attempt to unravel and resolve the disputed aspects of Ohio’s Medicaid plan, we believe it was the duty of the bankruptcy court in the first instance to undertake this most difficult task. This was not done. Evidence presented at trial did indicate a prospective system was in effect. For example, among documents tendered, but not *444 received in evidence by the court, was a handbook purportedly issued by the Ohio Department of Public Welfare, relating to the medical assistance program, and revised on July 4, 1977. According to that handbook, at least, Ohio had undertaken to establish a prospective basic rate for the fiscal year of 1976 and subsequent years. Other exhibits before the court indicated that Ohio had, at some time, presented such a plan to the Secretary of HEW. There is also in the record a letter, dated December 30, 1976 by Clyde V. Downing, Regional Commissioner of HEW for Region 5, and directed to Mr. Richard G. Sheraton, Ohio Legislative Budget Director, which indicated that a proposed prospective plan had been prepared and was ultimately approved by HEW. Further evidence in the record suggests that Ohio had, in fact, proceeded in disbursing Medicaid funds in 1976 upon the basis of its prospective plan.
At the same time, Collins has raised disturbing challenges to the validity of any such system. For example, Collins points to language in the 1975 and 1976 ODPW appropriation acts of the Ohio legislature that required reimbursement of nursing homes licensed under the Social Security Act for “the reasonable cost incurred for the care, comfort, and safety of patients.” Ohio Am. Sub.H.B. 155 (effective June 29, 1975 through June 30, 1976) and Ohio Am.Sub. H.B. 1546 (effective July 1, 1976 through June 30, 1977) (emphasis added).[11] Collins contends that “incurred” indicates a retrospective system, based on actual costs. Ohio, in response, presents other language in those appropriation bills which provides that payments to nursing homes should be made for authorized care on a “reasonable cost-related basis.” Id. Ohio argues that this provides the necessary statutory underpinning for the state’s plan for a prospective basic rate. Without knowing the exact terms and requirements of Ohio’s plan for 1976, we cannot resolve this issue.
Other serious questions are raised by Collins’ counsel which ought in the first instance to have been resolved at the trial level. He contends that formal approval of the prospective system by HEW did not come until December 30,1976, at the end of the year during which Ohio claims the system was in effect. Collins argues this violates the specific provision of Title XIX that no plan shall be in effect until it has been submitted to the Regional Director and approved by him as in compliance with the requirements of Title XIX and federal regulations pursuant thereto. See 42 U.S.C. § 1396a(a)(13)(D) (1976); 45 C.F.R. § 250.30(a)(2) (1976).[12] If the prospective plan was not therefore in effect, it is Collins’ position that the retrospective plan previously existing must necessarily be applied in 1976.
*445 Unfortunately, these questions were not addressed by either the bankruptcy or district court, and they are inadequately presented in the briefs before us. So far as the record before us is concerned, there are numerous inadequacies. First, the record contains only provider agreements that were effective from October 1,1976 to September 30, 1977, but none is present for earlier in 1976. Complete provider agreements should be supplied either by originals or authenticated copies for all of the nursing homes involved in that year and covering the entire calendar year 1976. In addition, we are not furnished with a complete, coherent copy of Ohio’s Medicaid plan itself as in effect during 1976; nor are we offered any adequate explanation, if one exists, when such a plan was submitted and approved and why, if authority for the plan’s approval comes from the letter of December 30, 1976, such approval would be effective retroactively in view of the cited statutory provision.
On remand, there will also be an opportunity to obtain additional testimony regarding Medicaid and Ohio’s plan during 1976. The only witness for the state in the bankruptcy court trial was Carson Carter. At the time of trial, Carter was chief auditor for ODPW. It is apparent from a reading of the record that Carter’s personal integrity was unchallenged and that he was a forthright and candid witness. His testimony concerning matters of which he had appropriate knowledge was readily accepted and indeed was most helpful in unscrambling most of the outstanding differences in accounting. Because he was not a lawyer, because he was not employed by ODPW during the earlier accounting period in question, and because the court itself was convinced that it had an independent obligation to take judicial notice of the applicable law, much of the testimony which the state sought to so elicit from Carter regarding the 1976 reimbursement system was excluded or disregarded by the bankruptcy judge.
■ It is, in fact, uncertainty about the regulatory scheme and the resulting limitation on the court’s ability to take judicial notice of that scheme which lies at the heart of the conflict in this appeal. When it became apparent that the bankruptcy judge was altogether unsympathetic with any concept of the principles of prospective reimbursement purportedly adopted by Ohio during 1976, the state sought, as an aid to the court, to produce Mr. Clark Law, Executive Assistant to the Director of ODPW, who Ohio hoped would be able to explain in expert fashion the legal complexities of the Medicaid scheme and Ohio’s role in it. Because Law’s name was not listed among those witnesses whom the state intended to call, the bankruptcy judge refused to permit him to testify. The judge also observed that Mr. Law would only have testified to matters of law and that, as a judge, he would be presumed to know the law, anyway. This might ordinarily have been an altogether proper ruling. The witness was not originally listed, and usually federal judges are presumed to know not only the law of the United States, but the law of the state in which they sit.
This rule is, however, not immutable. We believe that when the legal inquiry extends to a complex scheme such as Medicaid, and when the state regulations are not readily available in published form, a court should not hesitate to seek out all of the practical assistance it can obtain in its function as ultimate determiner of the law.[13] *446 The bankruptcy judge stated that he had an obligation to take judicial notice of valid federal and state statutes and regulations, but his findings reflect a complete disaffection with any concept of prospective reimbursement. He was interested only in the actual costs and in a fair auditing for 1976. Because of the state’s noncompliance with the court’s local rules regarding pretrial disclosure of witnesses and evidence, the bankruptcy judge deprived himself of the means by which he could have informed himself of the posture of Ohio’s Medicaid law and plan during 1976. While, as we have mentioned earlier, a great deal of the fault must lie at the door of the State of Ohio, we nonetheless conclude that such concerns, however otherwise justified, had to give way to the overriding need of the court to ascertain the proper status of Ohio law during the period in question and to apply it to the determination of the state’s claim against the bankrupt. Courts must, in all events, be courts. They must do their job.
The exact parameters of judicial notice of state laws and regulations are rarely tested. Ordinarily, recourse may be had to published and easily available documents evidencing them. Surely the publication of regulations, such as occurs in the case of the federal government, would simplify the bankruptcy judge’s job and ours. Unfortunately, the Ohio legislature did not authorize and require the publication of the state’s administrative regulations until late 1976.[14] Thus there is no readily available source from which this court can independently ascertain the exact status of the Ohio regulations in effect in 1976 and earlier. We believe that it was appropriate for the state to have offered expert testimony and documentary proof as to matters of Ohio’s regulatory scheme which ordinary diligence would not unearth.[15] It is beneficial for the trier of fact to take the initiative to uncover and familiarize itself with the appropriate legislative and historical facts needed for decision. We remand for that purpose.
IV.
At the trial in the bankruptcy court, Collins contended that the figures for 1973 through 1975 were not complete because they did not take into account owner’s compensation, depreciation, and return on equity. While Ohio disputed whether the 1978 audit included any amounts representing depreciation and return on equity, it appears generally to be admitted that the State of Ohio declined to recognize any award to Collins in the form of owner’s compensation. On this appeal, the parties have only raised the issue of owner’s compensation.
*447 The bankruptcy judge did not rule specifically on Collins’ counterclaim for return on equity and depreciation because of his finding that Collins’ entitlement to owner’s compensation would eliminate any claim which the State of Ohio might have against him and because of Collins’ counsel’s admission in closing argument that the Eleventh Amendment would bar an affirmative award against Ohio. The bankruptcy judge recognized that, at least for 1973 through 1975, Collins was entitled to seek credit for “owner’s compensation” under Ohio’s rules, notwithstanding the activity for which he was indicted and convicted. Essentially this position was correct, because ODPW’s Administrative Review Panel had in fact ruled that Collins was to be awarded compensation, conditioned however upon the submission of “adequate documentation.” Ohio Admin. Review Panel Decision (May 17, 1978), App. 197. Purportedly in compliance with the Review Panel’s requirements, Collins submitted affidavits to the bankruptcy court indicating that he had spent between 48 and 60 hours each week at the nursing homes for the years 1973 through 1976. Also, at the bankruptcy court trial Collins testified in his own behalf in support of his counterclaim for owner’s compensation, and a witness on his behalf testified to his opinion that a reasonable compensation was $55,000 per year. Ohio’s witness Carson Carter testified that the reasonable value for those services, taking into account the number of nursing homes and patients and the usual charges, would have approximated $22,000.00. Nonetheless, the state had refused to honor any claim in this amount, primarily because it conceived that Collins had altogether failed to provide “adequate documentation” within the meaning of that term as described by the Adminislative Review Panel. Collins’ figures were not based upon any contemporaneous records, but were instead supported only by his sworn affidavit prepared many years after the event.
In his determination, the bankruptcy judge conceived that he was entitled to proceed upon the best evidence presented to him at that juncture, given the ruling of the Administrative Review Panel. He therefore determined as a matter of fact that reasonable compensation for Collins’ services during 1973-75 was $40,000.00 per year. The state does not contend that the amount is necessarily incorrect as a clearly erroneous finding of fact; instead, Ohio argues that it was entitled, under its own regulations and its Administrative Review Panel ruling, to require “adequate documentation.” It maintains that the post facto, sworn testimony of one who had been seven times found guilty of fraud did not meet the minimum standards of adequacy.
We have some sympathy with Ohio’s view here, but are unable to resolve the conflict upon the record before us. Instead, we must remand the question of owner’s compensation to the bankruptcy court.
It would appear to us that the question of “adequate documentation” is in the first instance a matter largely left to the discretion of the State of Ohio, provided it does not act in an arbitrary or capricious manner or otherwise deprive the vendor of due process. The federal Medicaid statute and regulations require states to obtain documentation from providers.[16] If, in fact, the State of Ohio had in existence understandable rules concerning the computation of owner’s compensation or had required certain forms of proof to support such claims, and if a reasonable vendor would have un *448 derstood those requirements at the time, we believe that the bankruptcy court could not interpose its own independent judgment to waive compliance, especially wheré noncompliance resulted from fault and neglect of the vendor himself. As in Part II of this opinion, we conclude that the bankruptcy judge was required to apply state and federal Medicaid law. He could not disregard established state rules or terms of the provider agreements requiring documentation merely because it seemed “equitable” for Collins to receive compensation.
Although the State of Ohio did not come forward with any clearly articulated rules or regulations, any efforts it did make to clarify its position were rebuffed by the bankruptcy judge on the theory that he was not to be governed by such concepts in the first place. If Ohio had a requirement that owner’s compensation be documented with contemporaneous records during 1973 to 1975, it should have a chance to demonstrate what that requirement was. If it succeeded in so doing, Collins in turn should be fairly held to- those means for proving his claimed compensation.
Accordingly, on remand, the State of Ohio should be expected in the first instance to come forward with reasonably reliable evidence concerning the practices which the state employed among other similar vendors during the appropriate periods in time in determining the amount of owner’s compensation. Ohio might address numerous questions. Did Ohio’s Medicaid plan in fact require contemporary records? Or was it, as some of the evidence tends to indicate, a matter of a formula based upon the number of patients or the overall cost of the operation? How were other vendors treated and did Collins have a reasonable expectation to be treated similarly? If Collins was treated differently, did the state demand more of him than it did of others? Was Ohio entitled to reject Collins’ claim altogether because of the unreliability of his affidavit, given his conviction for seven counts of mail fraud?
While the state does not specifically challenge the reasonableness of the bankruptcy judge’s factual finding that Collins’ services were worth $40,000.00 per year, it is apparent that these figures were arrived at without any mathematical or logical precision. Common sense indicates the amounts due each year would necessarily vary because of inflation, as well as differences in hours worked and services performed. In our view, after the bankruptcy judge concluded that owner’s compensation for 1973-75 exceeded the amount of Ohio’s claim for those years, the exact amounts for those years were immaterial because he could not enter an affirmative judgment against the state. Given the other errors which affected these proceedings, we believe the best course is to remand the issue of owner’s compensation for a complete redetermination, including the factual question of the value of Collins’ services. At the same time we agree with the bankruptcy judge that, if he adequately documented it, Collins was entitled to some compensation as a setoff to other money he might owe the state on its claim.
V.
In conclusion, we vacate in their entirety the orders which have been the subject of our review, and we remand in turn to the bankruptcy court, or otherwise according to law, for a reopening of proofs and a rife novo review to the extent necessary to produce findings and rulings consistent with this opinion. It is our hope that, upon remand, the courts and the parties will not dwell unduly upon any distribution of the fault for what has occurred. There is enough for everybody but little profit in pursuing that matter further. We have, we admit, been perhaps unduly sensitive to Ohio’s prerogatives as a sovereign state, given its role in the blame, but we conclude that at least one further effort is owed to unscramble the morass and bring the rights of both the state and of the bankrupt into conformity with the state and federal scheme. With a more refined understanding of that scheme and a better explication of it on the part of the bankruptcy court, and perhaps on the part of the district court thereafter, many of the issues we have raised may be significantly resolved.
*449 Reversed and remanded with instructions.

. The Medicaid Act requires[1] states to designate or establish a state agency to administer the state’s Medicaid plan. 42 U.S.C. § 1396a(a)(5) (1976). In Ohio, the Department of Public Welfare has responsibility for the state’s plan. Ohio Rev.Code § 5111.02 (Banks-Baldwin).

. In 1973, Collins owned seven nursing homes, but one home went out of business before Collins filed for Chapter XI protection in 1978.

. Under the concept of owner’s compensation, a sole proprietor or partner is reimbursed for the reasonable value of services rendered by the owner to the nursing home. Return on equity, on the other hand, provides an allowance for a reasonable return on equity capital invested and used in the care of the nursing home patients.

. In a companion appeal also decided today, but heard separately before a different panel of the court, we upheld Ohio’s assertion to sovereign immunity and reversed the orders of the bankruptcy court directing payments of Medicaid asserted for July and August 1978 after both petitions in bankruptcy had been filed. Ohio v. Madeline Marie Nursing Homes # 1 and # 2, 694 F.2d 449 (6th Cir.1982).

. Ohio states at page 2 of its brief to this court:
The District Court held that the findings of fact made by the Bankruptcy Court were not “clearly erroneous.” The District Court also summarily held that “no error of law [was] committed by the Bankruptcy Judge .... ” Decision of the District Court at 2, Joint Appendix at 261. It is the latter holding that serves as the basis for this appeal.

. The original Deep Rock case was Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939), involving the reorganization of the Deep Rock Oil Corporation. In that case, the claim of a corporate parent was subordinated to those of junior security holders based on the parent’s mismanagement of the subsidiary. Professor Hill limited his use of the label Deep Rock doctrine to subordination in corporate reorganizations, see Hill, The Erie Doctrine in Bankruptcy, 66 Harv. L.Rev. 1013, 1014-17 (1953), while terming other equitable changes in distribution “equitable subordination.” Id. at 1020-24. Professor Countryman suggested that bankruptcy courts could use the Deep Rock doctrine in a greater variety of circumstances. See Countryman, The Use of State Law in Bankruptcy Cases (Part 1), 47 N.Y.U.L.Rev. 407, 426-31 (1972). Under either label, the cases stand for the principle that bankruptcy courts may apply equitable principles in determining allowability and the order of distribution from the estate. See, e.g., Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); American Surety Co. v. Sampsell, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946); Prudence Realization Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293 (1942); Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

. Commentators have also concluded that state law should be the basis for determining the underlying obligations of a claim:
[T]he Bankruptcy Act does not provide a body of law, to be applied retroactively, in the establishment of claims. Hence, the existence and amount of the bankrupt’s liabilities, though determined by the bankruptcy court in allowing or disallowing claims, will inevitably be determined by nonbankruptcy, usually state law.
Countryman, supra, at 412.
[TJjnless the Bankruptcy Act itself provides a different rule, the validity or invalidity of a creditor’s claim is unaffected by bankruptcy.
3A Collier, supra, ([ 63.03 at 1772 (footnote omitted).
Although federal law governs the disposition of claims to the debtor’s assets, state law clearly governs the creation and definition of those claims.
Note, Bankruptcy and the Limits of Federal Jurisdiction, 95 Harv.L.Rev. 703, 705 (1982).

. In Green v. Cashman, 605 F.2d 945, 946 (6th Cir.1979), our court, in passing upon Ohio’s procedures for terminating Medicaid payments to a nursing home, observed that “[w]e do not find in the statute authorizing Medicare and Medicaid any legislative intention to provide financial assistance to providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities.” Nevertheless, we do not believe on that account Collins or other providers lack standing to challenge Ohio’s Medicaid plan as inconsistent with the federal statute. See Roe v. Ferguson, 515 F.2d 279, 281 (6th Cir.1975).

. The other criteria for approval of a plan were:
(a) Incentives for efficiency and economy;
(c) Reimbursement not to exceed that which would be produced through the application of the title XVIII standards and principles of reimbursement, as modified under paragraph (a)(2)(l) of this section;
(d) Assurance of adequate participation of hospitals services of high quality to title XIX recipients;
(e) Adequate documentation for evaluation of experience under the State’s approved reimbursement plan.
45 C.F.R. §§ 250.30(a)(2)(ii)(a), (c)-(e) (1976).

. In this respect, such plans were not unlike those in effect during World War II whereby the government procurement of arms and am-munitions from manufacturers was on a “cost plus” basis. Under such systems, the government generally agreed to reimburse the manufacturers or supplier of the service for expenses actually incurred plus an additional factor for profits, overhead, and the like. The advantage of such a system was, of course, to alleviate the hardship of the flat fee system, but it was in turn accompanied by a strong tendency in such a payment scheme to promote and encourage inefficiency.

. The appropriation bill for 1977-78, by contrast, explicitly mandated the use of a prospective system:
Payment by the Department of Public Welfare ... for authorized care in certified nursing homes ... shall be made on a “Prospective Reasonable Cost-Related Basis” calculated from cost reports filed by each participating facility. “Prospective rate” refers to a predetermined, cost-related rate of reimbursement or fee calculated by the Department of Public Welfare for each nursing home based upon a cost report of the facility for a prior cost reporting period. The rate so established is not subject to subsequent or retroactive settlement based upon subsequent cost reports.
Am.Sub.H.B. 221 § 17 (eff. November 23, 1977).

. Title 42 U.S.C. § 1396a(a)(13)(D) requires that the State plan be “approved” by the Secretary of HEW, and under the regulations, the reimbursement method “shall be developed by the State and approved in advance of implementation by the Regional Commissioner .... ” 45 C.F.R. § 250.30(a)(2) (1976) (emphasis added).
In Hospital Association of New York v. Toia, 73 F.R.D. 565 (S.D.N.Y.1976), remanded on other grounds, 554 F.2d 12 (2d Cir.1977), the court held that New York’s prospective system could be applied only after the date of HEW approval, rejecting the idea of retroactive approval. Cf. Columbia Heights Nursing Home and Hospital, Inc. v. Weinberger, 380 F.Supp. 1066 (M.D.La.1974) (refusing to allow retroactive application of Medicare accounting procedures); but cf. Springdale Convalescent Center v. Mathews, 545 F.2d 943 (5th Cir.1977) (approving retroactive application of Medicare regulation).

. Federal Rule of Evidence 201 provides that a federal court may take judicial notice of “adjudicative facts” but does not control a court in its search for the proper domestic law to be applied. The Notes of the Advisory Committee make it clear that this rule was not intended to apply to judicial notice of “legislative” facts:
The omission of any treatment of legislative facts results from fundamental differences between adjudicative facts and legislafive facts. Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body.
*446 Continuing, the Notes quote Professor Morgan on the independent duty of a judge to ascertain the applicable law:
“In determining the content of applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion .... * * * [Tjhe parties do no more than to assist; they control no part of the process.”

. In Am.Sub.H.B. 317 (eff. 9-30-76), the General Assembly amended sections 111.15, 119.-03, and 119.04 and added section 103.05 of the Ohio Revised Code to “require the publication of the rules of state agencies.” Preamble to Am.Sub.H.B. 317. For years after 1976, ODPW Medicaid regulations may be found in Ohio Administrative Code (Banks-Baldwin) with updates kept in the Ohio Monthly Record (Banks-Baldwin). The present Medicaid regulations are found at Chapter 5101:3-1 of the Administrative Code.
Further, the Ohio legislature made the method of reimbursement for skilled nursing home facilities more explicit in Am.Sub.H.B. 176 (1979). The provisions of this bill relevant to nursing reimbursement are codified at §§ 5111.20-99. These provisions, however, did not become effective until July 1, 1981, after the years relevant to this appeal.

. It may be necessary for Ohio to present copies of its Medicaid plan for 1976 and authenticate those documents as being the plan actually in effect for that year. Where regulations are not published or available through law libraries, it may be necessary to have them admitted into evidence as with other forms of documentary evidence. Cf. Cambell v. Mincey, 413 F.Supp. 16 (N.D.Miss.1975), aff’d 542 F.2d 573 (5th Cir.1976) (court refusing to take judicial notice of unpublished state regulations); IX Wigmore on Evidence § 2572 at p. 760 (Chadbourne Rev.1981) (“The regulations of executive departments and administrative boards are sometimes, but not always noticed.”) (emphasis in original).

. 42 U.S.C. § 1396a(a)(27) (1976) requires the State plan to:
provide for agreements with every person or institution providing services under the State plan under which such person or institution agrees (A) to keep such records as are necessary fully to disclose the extent of the services provided to individuals receiving assistance under the State plan, and (B) to furnish the State agency with such information, regarding any payment claimed by such person or institution for providing services under the State plan, as the State agency may from time to time request;
(emphasis added). Further, the 1975 regulations state that one criterion for approval of the state plan be “[a]dequate documentation for evaluation of experience under the State’s approved reimbursement plan.” 45 C.F.R. § 250.30(a)(2)(ii)(e) (1975).