ENGEL, Circuit Judge.
In this appeal, the State of Ohio challenges the validity of two orders issued by a bankruptcy judge for the Southern District of Ohio, Western Division, requiring Ohio to reimburse bankrupt Phil C. Collins for monies spent in operating six nursing homes during July and August of 1978. Collins claimed that the monies were due him under the Medicaid program.
The underlying dispute between Collins and the State of Ohio is set out in more detail in a companion opinion issued concurrently, but heard by another panel of this court. In re Madeline Marie Nursing Homes, 694 F.2d 528 (6th Cir.1982). Disagreement stems basically from audits in 1977 and 1978 which Ohio made of Collins’ Medicaid accounts covering 1973 and subsequent years, and which resulted in Collins’ conviction of seven separate counts of mail fraud in connection with the procurement of Medicaid funds for the year 1973. That conviction was affirmed by this court in United States v. Collins, 596 F.2d 166 (6th Cir.1979) (per curiam). Ohio attempted to terminate Collins’ status as a provider of Medicaid services under the Medicaid plan in early 1978, but in February of that year, Collins obtained a preliminary injunction from the Hamilton County Ohio Common Pleas Court enjoining the State of Ohio from terminating his status as a provider of services, at least until proper notice and opportunity for a termination hearing had been accorded him. Collins v. Ohio Dept. of Public Welfare, No. A7800918, prelim, inj. (Ct. of Common Pleas, Hamilton County, Ohio February 17, 1978).[1] This injunction was not officially dissolved until September 12, 1978, when Collins dismissed the action. On July 7, 1978, the Ohio Department of Public Welfare (“ODPW”) (the Ohio state agency which administers the Medicaid program) filed a motion for garnishment in the Franklin County Court of Common Pleas, *452 stating in the motion that ODPW had reason to believe the Auditor of the State of Ohio had in his possession money due Collins and requesting the state court to issue a writ of garnishment for that money. The Franklin County Court issued the garnishment on July 14, 1978. State of Ohio v. Collins, No. 78CU-07-3177 (Ct. of Common Pleas, Franklin County, Ohio July 14,1978).
On July 21, 1978, Collins filed two petitions under Chapter XI of the Bankruptcy Act of 1898,[2] 11 U.S.C. § 701 et seq. (1976) (repealed 1979), one petition covering two nursing homes held in limited partnership with his wife, and one petition for four nursing homes owned by Collins as sole proprietor. Also, on July 21, Collins filed an application for a turnover order in each Chapter XI proceeding in the bankruptcy court, alleging that Ohio had in its possession checks totaling approximately $45,-000.00 which had been written to reimburse Collins for expenses in running his nursing homes. Allegedly, this money was due him as a provider of Medicaid services under separate provider agreements with Ohio covering each nursing home. According to the applications, the checks were withheld pursuant to the pre-judgment attachment proceedings in the Franklin County Common Pleas Court. On the same day that the applications were filed, the bankruptcy judge issued two orders against the State of Ohio directing it to turn over the checks or show cause on July 25 why immediate payment had not been made.
In compliance with the July 21 turnover orders, Ohio sent five state warrants to the bankruptcy court authorizing payment of $43,629.00. In transmitting the warrants to Collins, Assistant Attorney General Patrick V. Kerrigan advised him:
Although these warrants were prepared and processed because of the preliminary injunction in Hamilton County Common Pleas Court Case No. A7800918, the position of the State of Ohio is that no money is due and owing you for Medicaid reimbursement until the matter of past over-payments is settled. I trust you will make every effort to make the necessary adjustments as soon as possible.
App. 38. Ohio did not appeal the July 21 turnover orders.
On August 14, 1978, the bankruptcy judge issued another turnover order directing the State of Ohio to turn over monies which Collins, as a debtor in possession, claimed were due under the Medicaid program to the bankrupt’s estate for the month of July, 1978. Technically, therefore, those sums represented an alleged obligation of the State for monies paid out both before and after the date of filing in bankruptcy. In a letter dated August 14, ODPW again asserted its position that Collins was neither owed nor entitled to receive payments under the Medicaid program, for three reasons: (a) Collins had no current provider agreements with the ODPW, the previous agreements having expired and Collins having had a hearing on his termination;[3] (b) Collins had been convicted of a criminal offense relating to the Medicaid program which gave Ohio the right under federal law to refuse to renew the provider program;[4] and finally, (c) Collins had not filed cost reports which were required by regulation as a condition to *453 continued eligibility.[5] The auditor therefore refused to make payments, asserting that to do otherwise could compel him to violate state law. Copies of this letter were also sent to the bankruptcy judge. Four days later on August 18, a hearing was scheduled before the bankruptcy judge. At that time, no witnesses were sworn nor formal arguments made. Instead the matter was handled by a tape-recorded conference between the parties and the judge in chambers. After the conference, the bankruptcy judge issued another turnover order that applied to both Chapter XI proceedings and directed the Auditor of the State of Ohio “to forthwith release sums being held by the Auditor to the debtor-in-possession in the total amount of $39,745.61 ...” In noting objections raised by Ohio to these orders,
In making this order the Court recognizes that there are certain differences between the positions of the State of Ohio and its various agencies and the debtor-in-possession as to whether or not any sums are due.
That controversy, however, being an issue away and apart from the present necessity to operate the nursing homes, shall no doubt be litigated in the proper way at the proper time.
Although Ohio turned over the warrants to Collins as directed, the state also filed a timely notice of appeal of this order to the district court on August 25, 1978.
On September 8, 1978, an assistant attorney general of Ohio wrote to the bankruptcy judge and informed him that the auditor of the State of Ohio would not voluntarily turn over any additional funds: “although I was personally ordered to turn over checks to Mr. Collins the last time, before I had an opportunity to request a stay, I do not expect to turn over any checks this time.” Ex. A to Application for Show Cause Order, September 11, 1979. Acting on a further application for a show cause order filed by Collins, the bankruptcy judge again issued a show cause order on September 11, 1978 requiring the auditor and the assistant attorney general to appear and show cause why “payments due for Medicare [sic Medicaid] services rendered to patients by the nursing homes herein for the month of August, 1978 ...” were not turned over. On September 12, 1978, the state court injunction issued by the Hamilton County Common Pleas Court was dissolved when Collins dismissed that action. The state injunction against termination of Collins’ provider reimbursement appears therefore to have been in effect up to that date.
On September 18,1978, at a hearing held on the September 11 show cause order, the Director of the ODPW testified that warrants were not in existence to pay Collins for August and, in fact, the ODPW had not prepared computer tapes to authorize such payment. Counsel for the state further challenged the propriety of the turnover order, observing that “if in fact there is a debt that is due and owing to Mr. Collins by the State of Ohio, it seems to me that this Court has to determine that that debt constitutes an asset and a constructive possession of the debtor in possession. I have not heard that determination and I don’t think the court can issue that summarily. I think, again, that we should have a hearing on that question.” In response, the bankruptcy judge observed only, “[w]e are here.” Trans. 30-31. Notwithstanding this statement, there is nothing in the record to indicate that evidence was presented on the issue whether Ohio had possession of assets belonging to the bankrupt’s estate. Evidence did show, however, that the provider agreements with Collins had not been renewed in the spring of 1978. The bankruptcy judge stated that in the absence of such actual provider agreements, he had power to “deem” their existence. Id. at *454 154. There was also discussion whether alternative beds existed in the Cincinnati area to accommodate the Medicaid patients in Collins’ homes if the State of Ohio wished to move them out.
After the hearing, the bankruptcy judge issued an order on September 18, 1978 which “directed the State of Ohio through its various agencies, departments and personalities to pay the Medicare [sic Medicaid] payments to the rest homes involved herein for services for the month of August, 1978. That program shall continue month by month under this order until the court modifies or abolishes it in the same manner as was done under the order of Judge William S. Matthews [sic Mathews] of the Hamilton County Common Pleas Court, to which the State of Ohio acceded and acted without a ‘provider’ [agreement].” To Ohio’s challenge that he was without jurisdiction to enter such an order, the bankruptcy judge further observed: “The State of Ohio has filed a proof of claim in these proceedings and, thus, is within the jurisdiction of this court as well as are all of its agencies and departments.”
The bankruptcy judge also rejected Ohio’s argument that it owed Collins no money: “the Ohio obligation for Medicare [sic Medicaid] is fixed, it is only to whom payments should go, that is in dispute. Hence, there would be no damage to the State of Ohio in carrying out its obligation to Medicare [sic Medicaid] patients.” The bankruptcy judge’s order cited neither state nor federal law. Apparently, he assumed that Ohio had a legal obligation to provide reimbursement to whoever gave services to the patients in the nursing homes, although provider agreements did not exist and the state court injunction had been dissolved.
On September 20, 1978, Ohio filed its timely notice of appeal to the district court from the September 18 order. After consolidation of the appeals from the August and September orders, Ohio raised two issues before the district court. First, it challenged the bankruptcy judge’s use of turnover orders, arguing that Collins failed to establish that Ohio had possession of property belonging to the bankrupt’s estate. Second, Ohio argued that as a matter of law it was not obliged to pay Collins because no valid provider agreement existed covering the period in question and the required payment thus violated the state’s obligation to both state and federal regulations. On September 22, 1980, the district court affirmed the orders of the bankruptcy judge in relatively abbreviated fashion, concluding that factual determinations of the bankruptcy judge were not clearly erroneous, and further observing that he was “unaware of any authority ... that the State of Ohio can avail itself of the jurisdiction of the Bankruptcy Court in seeking recovery of its claim and deny the jurisdiction of the Court when it orders payment to the Bankrupt from assets which the State of Ohio has in its possession.” Ohio v. Madeline Marie Nursing Homes, Nos. C-1-78-640/722, order at 4 (S.D.Ohio Sept. 22, 1980). A timely appeal was taken to this court.
I.
Initially, we note a serious question whether summary turnover procedures would be justified under these circumstances even were the state an ordinary private party. In Willyerd v. Buildex Company, 463 F.2d 996 (6th Cir.1972), the bankrupt estate had obtained a turnover order against Buildex based on a prebankruptcy contract between Buildex and the bankrupt Willyerd. We held that before issuing a turnover order against property held by Buildex the bankruptcy court was required to make a determination that Buildex’s claim to the property was “ ‘so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color or merit and a mere pretense.’ ” 463 F.2d at 999. If, however, the court found that Buildex’s claim to the property was “real and substantial,” then the bankruptcy court would not have summary jurisdiction and could not employ the device of a turnover order; instead, Buildex ought then to have been accorded all of the rights and protections of a plenary action in a court of proper jurisdiction. Id.
*455 In the present case, the bankruptcy court did not make a preliminary inquiry to determine whether Ohio had a real and substantial claim to the funds in question. Nevertheless, we believe that the record developed at the show cause hearings and the law regarding the Medicaid system indicate that Ohio should not have been subject to the summary jurisdiction of the bankruptcy court in a turnover proceeding.
Many factors bear upon the potential legal liability of the State of Ohio to reimburse the bankrupt estate for monies which are claimed to be due, and the position of the bankruptcy judge is at least understandable. He conceived himself to be responsible for the welfare and protection of the patients at the several nursing homes until such time as they could properly be transferred to homes elsewhere or until other arrangements could be made for their care. However, we observe that it does not necessarily follow that the State of Ohio is obligated to Collins simply because he was housing patients who might otherwise be eligible for Medicaid.
In Green v. Cashman, 605 F.2d 945 (6th Cir.1979), we emphasized the contractual nature of the arrangement between the state and a Medicaid provider. There the provider had been terminated by Ohio and had filed an action in federal court arguing that he had a due process right to a prior hearing. Discussing the provider’s role in Medicaid, we observed:
Whatever rights [the provider] has appear to us to arise exclusively from a contract called a “Provider” agreement .... We do not find in the statute authorizing Medicare and Medicaid any legislative intention to provide financial assistance to providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities.
605 F.2d at 946.
Of similar import is O’Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). In O’Bannon, nursing home residents had brought an action alleging that they were entitled to an evidentiary hearing before the government discontinued Medicaid payments to the nursing home in which they were residents. While, as here, this concept had certain strong humanitarian appeal, the federal government, acting through the Department of Health, Education and Welfare, had refused to approve provider agreements under Medicare, and Pennsylvania’s Department of Public Welfare had also refused to renew its Medicaid provider agreements. In affirming the district court, the Third Circuit, in two en banc decisions, held that the nursing home provider did not have a due process right to a pretermination hearing, Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266 (3d Cir.1978), but that the patients themselves did have a constitutional right to such a pretermination hearing, Town Court Nursing Center, Inc. v. Beal, 586 F.2d 280 (3d Cir.1978), rev’d., 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). Granting certiorari only on the latter case, the Supreme Court reversed and held that the actions by HEW and the Pennsylvania DPW did not deprive the patients themselves of any constitutionally protected interest in life, liberty or property. In so holding, the Court stated: “while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified." O’Bannon, supra, 447 U.S. at 786, 100 S.Ct. at 2475-2476 (emphasis added). Justice Stevens further observed that 42 U.S.C. § 1396a(a)(23) (1978 ed. Supp. II),
[b]y implication ... confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.
447 U.S. at 785, 100 S.Ct. at 2475 (emphasis added). Under Green v. Cashman and *456 O’Bannon, therefore, Ohio could refuse to provide reimbursement to a provider which did not have a provider agreement with the state or had otherwise been terminated for failing to meet Medicaid standards.
It would appear on the face of the record before us that benefits were sought to be recovered directly from the state treasury through orders issued by the bankruptcy judge although there was not in effect any provider agreement and although the nursing home’s right to Medicaid benefits under Ohio law had been lawfully terminated. As we understand the facts before the bankruptcy judge, the first termination in February 1978 had been set aside by the OPWD’s Administrative Review Board and temporary agreements issued because Collins had been denied an adequate notice.[6] Nonetheless, this same Board held that good cause had been established for Collins’ termination.[7] Further, any failure to give Collins a hearing appears to have been fully remedied by the decisions of the Administrative Review Panel on June 2,1978 terminating him as of May 31,1978. This administrative hearing and the notice which was sent to Collins apparently fulfilled the conditions of the Hamilton County injunction for the termination of Collins’ reimbursement. We recognize that the state court injunction was not dismissed until September 12, 1978. While it is possible to interpret this injunction to require payment by Ohio until that date, a reasonable interpretation suggests that Ohio could terminate Collins upon satisfaction of the injunction’s condition. What is important, however, is that Ohio had at least a real and substantial claim to the property.
While we do not mean the foregoing observations to be binding upon any ultimate litigation which the bankrupt estate may seek to pursue against the State of Ohio in a proper forum, we nonetheless observe that those factors should have been considered by the bankruptcy judge in determining whether he had summary jurisdiction to enter a turnover order.
In Willyerd, we also observed that the preliminary inquiry to establish summary jurisdiction was necessary “absent consent” by Buildex to the bankruptcy court’s summary jurisdiction. 463 F.2d at 999. The record in the present cases does not indicate consent by Ohio to summary jurisdiction. Although ODPW had filed a proof of claim in the Chapter XI proceeding we do not believe this is sufficient for consent to summary jurisdiction. In Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), the Supreme Court held that when a creditor files a proof of claim it consents to summary jurisdiction to compel the surrender of preferences, which would have required disallowance under section 57g of the Bankruptcy Act of 1898, 11 U.S.C. § 93(g) (1976) (repealed 1979). When faced with the question whether the submission of a claim served as consent to summary jurisdiction over a counterclaim, “[t]he clear majority of courts have held that summary jurisdiction only extends to counterclaims arising out of the same transaction as the creditor’s claim and does not reach permissive counterclaims .... ” In re Oxford Marketing Ltd., 444 F.Supp. 399, 402 (N.D.Ill.1978).
The bankruptcy court in the present appeal, however, made no finding and did not indicate in any manner that it considered Collins’ action for payment for July and August (his “counterclaim”) against Ohio to be compulsory. Ohio’s original claim covered 1973 to 1975, but Collins was attempting to recover payments for July and August of *457 1978. The possible differences in time, contractual terms, regulations, and services provided indicate that Collins’ attempts to recover funds through the turnover procedure were not closely related to Ohio’s original proof of claim.
Finally, even if consent to summary jurisdiction were found, that alone would not justify a turnover order, as two other elements beyond proof of summary jurisdiction must be established: the trustee seeking the order must establish that the property involved is part of the bankrupt’s estate and that the party proceeded against has either possession or control of the property. See 2 Collier on Bankruptcy 123.10 at pp. 567-69 (14th ed. 1974). Based on the record before the bankruptcy judge and Medicaid law, we cannot say that Collins established by “clear and convincing evidence” that the funds in question were the property of the estate. Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948).
In our judgment, it was error for the bankruptcy judge to have proceeded in issuing the turnover orders without making the necessary findings in a preliminary hearing as a predicate to the orders. The bankruptcy judge’s conception that the issue of whether Ohio owed the money to Collins was “an issue away and apart from” the turnover proceeding was incorrect.
On this appeal, Ohio does not explicitly challenge the summary jurisdiction of the bankruptcy court, nor does it question the court’s styling of the orders as requiring the “turnover” of funds. Our discussion of the turnover procedure, however, is necessary to the consideration of the primary issues of this appeal: Ohio’s Eleventh Amendment immunity and the possibility the appeal is now moot. In our analysis of those issues, we must view the bankruptcy court’s orders from a practical point of view as money judgments against the State of Ohio. To consider the bankruptcy court’s orders as merely requiring the return to Collins of property of the bankruptcy estate would exalt form over substance.
II.
The State of Ohio has squarely raised before us the issue of its sovereign immunity from suit under the Eleventh Amendment to the United States Constitution. There is at least some suggestion in the record that the defense was interposed before the bankruptcy court with regard to the turnover orders. As we have observed in the companion suit, In Re: Madeline Marie Nursing Homes, No. 80-3549, supra, the bankruptcy judge himself later acknowledged the Eleventh Amendment immunity of the State of Ohio at least insofar as it barred Collins’ efforts to pursue a counterclaim against the State of Ohio in excess of the state’s claim in the Chapter XI proceedings. However, very little on this issue appears in the actual record before us in this case until the appellate briefs themselves. Earlier and more careful attention by the State of Ohio to its rights under the Eleventh Amendment might, in our opinion, have averted much of the difficulty and legal complications which thereafter ensued. This is not the type of legal issue with which bankruptcy courts are normally concerned, whereas the State of Ohio ought reasonably to be expected to be alert to its own privileges and immunities under the United States Constitution. This observation makes our task here the more difficult, but our necessary course is in any event no less certain because of it.
The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const.amend. XI. The Supreme Court set forth a number of well established principles concerning Eleventh Amendment immunity in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974):
While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal *458 courts by her own citizens as well as by Citizens of another State. It is also well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment.
415 U.S. at 662-63, 94 S.Ct. at 1355 (citations omitted).
Ohio argues that the turnover orders violated the Eleventh Amendment because they arose from an action against the state brought by one of its citizens in federal court. In response, Collins contends first the turnover orders fall within the exception of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Moreover, Collins argues, Ohio has waived any Eleventh Amendment immunity it might possess, and, in any event, compliance with the orders by Ohio has rendered the case moot.
A.
“A suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity. Alabama v. Pugh, 438 U.S. 781 [98 S.Ct. 3057, 56 L.Ed.2d 1114]. If the State is named directly in the complaint and has not consented to the suit, it must be dismissed from the action. Id., at 782 [98 S.Ct. at 3058].” Florida Department of State v. Treasure Salvors, Inc., - U.S. -, -, 102 S.Ct. 3304, 3314, 73 L.Ed.2d 1057 (1982) (footnote omitted). Thus, absent consent by the state, the turnover orders would violate the Eleventh Amendment to the extent they were directed to the State of Ohio or ODPW. Ex parte Young, however, held that the Eleventh Amendment was not a bar to all actions against state officials. An action had been brought in federal court to enjoin the Attorney General of Minnesota from enforcing a state statute claimed to violate the Fourteenth Amendment. The Supreme Court rejected Minnesota’s contention that the action was barred by the Eleventh Amendment, stating:
If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from the responsibility to the supreme authority of the United States.
209 U.S. at 159-60, 28 S.Ct. at 454.
Like the federal court actions in Ex parte Young, the turnover orders in the present appeal are directed at state officials[8] and are essentially equitable in nature. These facts alone, however, are not sufficient to place the turnover orders outside the Eleventh Amendment. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), clarified Ex parte Young to hold that equitable remedies cannot be used in federal court against a state official to order retroactive monetary awards.
In Edelman, officials of the State of Illinois were administering the Aid to the Aged, Blind, or Disabled Program in a manner that was inconsistent with federal regulations. Accordingly, the district court granted a permanent injunction which required compliance with federal regulations and also ordered the state officials to pay wrongfully withheld benefits to persons who had applied for those benefits between the date of the enactment of the federal regulations and the date of the injunction. The Seventh Circuit affirmed, only to be reversed by the Supreme Court insofar as the circuit court had upheld the judgment of retroactive benefits. Justice Rehnquist observed for the Court in Edelman that the Eleventh Amendment bar against retroactive awards was clearly set forth in Ford Motor Co. v. Department of Treasury, 323 *459 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Thus, “a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.” Edelman v. Jordan, supra, 415 U.S. at 663, 94 S.Ct. at 1356. Further, the bar against removing funds from the treasury may not be avoided merely by terming the award “equitable restitution.” Id. at 651, 94 S.Ct. at 1350.
We are convinced that the bankruptcy court’s orders directly compelled Ohio to pay monies out of the state treasury for liabilities which had allegedly been incurred by the state in the past. The turnover orders were based upon services previously rendered by the nursing homes for Medicaid patients. Collins himself concedes this in his brief to this court:
Each month the State refused to pay for care rendered by Collins in the prior month to Medicaid patients in his nursing homes. Each month, therefore, the Court issued a Turnover Order for the State to deliver to Collins the Medicaid reimbursement which he had earned ....
Appellee’s Brief at 12 (emphasis added). Clearly, the orders of the bankruptcy court did not compel payment for services to be rendered in the future; instead, the orders allowed Collins to “[conduct] a raid of the state treasury for an accrued monetary liability.” Milliken v. Bradley, 433 U.S. 267, 290 n. 22, 97 S.Ct. 2749, 2762 n. 22, 53 L.Ed.2d 745 (1977). Under Edelman v. Jordan, this form of retroactive award against a state, even if put in the form of equitable restitution, is barred by the Eleventh Amendment. Therefore, unless Ohio’s immunity has been waived in some effective way, we conclude that the orders of the bankruptcy judge were improper and must be reversed.[9]
B.
Collins advances several reasons for his claim that waiver has occurred. The most obvious basis here is that Ohio waived its Eleventh Amendment immunity by failing to articulate it clearly in proceedings before the bankruptcy court. Normally, defenses not raised in timely fashion in the trial court may not for the first time be asserted on appeal. This general rule, however, does not apply to a state’s Eleventh Amendment immunity. The Supreme Court in Edelman v. Jordan, supra, 415 U.S. *460 at 678, 94 S.Ct. at 1363, observed: “the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court .... ” We therefore similarly conclude that Ohio’s failure to raise the bar before the district court or before the bankruptcy court does not preclude its assertion here.
At the same time, we recognize that the Eleventh Amendment bar is not wholly jurisdictional in the sense of federal subject matter jurisdiction: a state may waive its Eleventh Amendment immunity, but a party cannot confer subject matter jurisdiction upon a federal court by consent. As Edelman v. Jordan makes clear, a waiver by the state can still occur, but only “ ‘by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.’ ” Id. at 673, 94 S.Ct. at 1361. Our review of the remaining theories of waiver asserted by Collins convinces us that Ohio has not waived its defense here.
That Ohio participates in the federal Medicaid program itself does not operate as a waiver of the State’s Eleventh Amendment rights. This contention was rejected in Florida Department of Health v. Florida Nursing Home Association, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Plaintiffs do not claim otherwise in their briefs.
Plaintiffs do suggest, however, that Ohio has waived its immunity by legislative action. If true, this would be the clearest expression of a waiver and one which has frequently been honored in the federal courts.
Article I, Section 16 of Ohio’s Constitution provides that:
Suits may be brought against the state, in such courts and in such manner, as may be provided by law.
Further, Article II, Section 22 provides in part:
No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law ....
That Section 16 of Article I is not self-executing and that there can be no waiver of Ohio’s sovereign immunity without legislation by the General Assembly is clearly established. See Krause v. Ohio, 31 Ohio St.2d 132, 285 N.E.2d 736 (1972). In Thacker v. Ohio State University Board of Trustees, 35 Ohio St.2d 49, 298 N.E.2d 542 (1973), the Ohio Supreme Court held that Krause also applies to Ohio State University and its hospital as instrumentalities of Ohio. These authorities convince us that neither the State of Ohio itself nor the Ohio Department of Public Welfare, an integrated official department of the state, could be sued without an explicit waiver of sovereign immunity by Ohio’s General Assembly.
Plaintiff claims that the Ohio legislature waived the state’s sovereign immunity from suit by the enactment of Ohio Rev.Code § 2743.02(A)(1), which provides:
The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims ....
However, where the sovereign consents to be sued in a specially designated court, any resulting waiver is not general but is confined to actions brought in the forum designated. The Court in Edelman v. Jordan stated with respect to a similar provision under Illinois law, “[wjhether Illinois permits such a suit to be brought against the State in its own courts is not determinative of whether Illinois has relinquished its Eleventh Amendment immunity from suit in the federal courts.” 415 U.S. at 677 n. 19, 94 S.Ct. at 1363 n. 19. Moreover, in Ohio Inns, Inc. v. Nye, 542 F.2d 673 (6th Cir.1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977), we upheld a district court determination that section 2743.02(A) of the Ohio Court of Claims Act amounted to a waiver of sovereign immunity only for claims which were themselves determined in the Ohio Court of Claims, but acted as no waiver for actions brought in a federal court. Clearly, therefore, there has been no constitutional or statutory waiver of Ohio’s Eleventh Amendment rights.
*461 The third and perhaps strongest argument made by Collins is that when Ohio filed its claim in bankruptcy it could not thereafter raise an Eleventh Amendment defense to the bankruptcy court’s jurisdiction. It was presumably on this basis that the United States District Judge affirmed the bankruptcy court’s assertion of jurisdiction to issue the turnover orders.
Generally, officers of a state cannot waive its Eleventh Amendment immunity by their mere actions. In United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940), the United States had filed a claim against a probate estate in Michigan only to be the target of a counterclaim. The Supreme Court held that the filing of the claim did not constitute waiver of the federal government’s sovereign immunity as to the counterclaim, holding: “without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction.” 309 U.S. at 500-01, 60 S.Ct. at 661 (footnotes omitted). An analogous principle was applied by our court with specific reference to Ohio law in Taylor v. Perini, 503 F.2d 899 (6th Cir.1974), vacated on other grounds, 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975), where we held that attorney fees could not be awarded against the State of Ohio despite the consent to those fees by the state attorney general in the district court. See generally Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 269 n. 44, 95 S.Ct. 1612, 1627 n. 44, 44 L.Ed.2d 141 (1975) (finding it unnecessary to reach Eleventh Amendment issue found in Taylor v. Perini). Taylor v. Perini in turn relied upon Grandle v. Rhodes, 169 Ohio St. 77, 157 N.E.2d 336 (1959). The rationale of Grandle v. Rhodes is clearly expressed in its syllabus:
Under the provisions of Sections 22 and 29, Article II of the Constitution of Ohio, before money can be taken from the state treasury specific authorization therefore must be by action of the General Assembly in the manner prescribed, and, where it appears that there has been no authorization by the General Assembly for the withdrawal of funds, the doors of the ' state treasury must remain closed to those seeking attorney fees for services rendered in a taxpayer's successful action to prevent the expenditure of public funds.
157 N.E.2d at 337. This precedent casts serious doubt on Collins’ argument that the State of Ohio allowed itself to be sued in federal court because an assistant attorney general filed a proof of claim in bankruptcy court.
Even assuming Ohio has authorized its officials to waive the state’s sovereign immunity, the actions of the state’s counsel in the present case did not indicate consent to the bankruptcy court’s jurisdiction over Collins’ claim for July and August. Although some cases have found waiver by certain specified conduct of individuals on behalf of the state, see, e.g., Moreno v. University of Maryland, 645 F.2d 217 (4th Cir.1981), affirmed sub nom. Toll v. Moreno, -U.S.-, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982); Vargas v. Trainor, 508 F.2d 485 (7th Cir.1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975), those cases have concerned state efforts to disavow agreements to pay retroactive benefits which had been entered into before the Eleventh Amendment immunity was claimed. Without deciding that such would be the law in Ohio and this circuit, it is sufficient for us to observe that clearly Ohio did not consent to or acquiesce in the orders from which these appeals have been filed. We need not, therefore, concern ourselves with the impact of Ohio’s honoring, and not appealing, the first turnover order for services rendered in June. By the time the August and September turnover orders were entered, Ohio’s objections had been interposed. We cannot construe the conduct of ODPW personnel and counsel acting on Ohio’s behalf, as a voluntary waiver by the state of its right to claim immunity here.
Finally, the Bankruptcy Act of 1898 does not require waiver of sovereign immunity as a condition to the filing of a claim. In Danning v. United States, 259 *462 F.2d 305 (9th Cir.1958), cert. denied, 359 U.S. 911, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959), the Ninth Circuit considered the question whether the federal government waives its sovereign immunity by filing a proof of claim in the bankruptcy court. The federal government had filed a tax claim against the bankrupt, and the trustee then filed a counterclaim seeking affirmative relief. The Ninth Circuit affirmed the holding of the bankruptcy judge that the filing of the claim did not waive the government’s immunity. Stating that sovereign immunity could only be waived by a specific statutory provision, the court examined the Bankruptcy Act of 1898 and concluded that the Act did not include legislative waiver of sovereign immunity. The court stated: “affirmative recovery against the sovereign is not a corollary of the sovereign’s right to sue or present a claim for bankruptcy adjudication.” 259 F.2d at 310. Accord, Chrome Plate, Inc. v. Dist. Director of Internal Revenue, 442 F.Supp. 1023 (W.D.Tex.1977); see also Jenkins, Jurisdiction of the Bankruptcy Court to Deal with Claims of the Sovereigns, Objections to Such Claims and Counterclaims Against the Sovereign, October 1969 J. of the Nat’l Conf. of Referees in Bankruptcy 104; cf. In re Oxford Marketing, 444 F.Supp. 399 (N.D.Ill.1978) (refusing to find waiver by sovereign’s filing claim because counterclaims did not arise from same transaction); but cf. United States v. Roth, 164 F.2d 575 (2d Cir.1948) (stating that section 68a of the 1898 Act waives sovereign immunity as to setoffs).[10]
Similarly, we find no provision in the Bankruptcy Act of 1898 which “ ‘by the most express language or by ... overwhelming implications from the text ...,’” Edelman v. Jordan, supra, 415 U.S. at 673, 94 S.Ct. at 1361, creates waiver of Ohio’s Eleventh Amendment immunity for the August and September 1978 orders based on the filing of proofs of claim for 1973-75.
Thus, we are fully satisfied that the act of filing a claim against the bankrupt’s estate regarding 1973 through 1975 can in no way be construed as consent on Ohio’s part to have the bankruptcy court adjudicate the state’s liability to Collins for Medicaid payments for July and August 1978.
C.
One issue remains. Collins claims that because Ohio has in fact paid the monies over to the bankrupt estate, its appeal of the orders compelling such payment is therefore moot. This issue is not without difficulty, since Rule 805 of the Rules of Bankruptcy Procedure,[11] carefully provides the procedures whereby stays of orders can be procured. Indeed, the Ninth Circuit in In Re: Roberts Farms, Inc., 652 F.2d 793 (9th Cir.1981), expressly held that failure of *463 the appellants there to seek a stay under Rule 805 pending appeal had resulted in such a comprehensive change of circumstances in the bankruptcy estate as to preclude consideration of the underlying issues and to result in the dismissal of the appeal for mootness. In so holding, the court observed:
In the field of administration of estates under the bankruptcy laws, the policy of the law strongly supports a requirement that a stay be obtained if review on appeal is not to be foreclosed because of mootness.
652 F.2d at 796.
We acknowledge that it may often be prudent to obtain a stay to protect one’s ability to appeal. We believe, however, that application of the broad rule of Roberts Farm in the present circumstances might have the unwelcome effect of encouraging disobedience to a court’s order if a stay could not be obtained, thus presenting the state with a choice of losing its right to appeal or noneompliance. Where the appellant is a state claiming sovereign immunity, this could put the state in an unseemly position at odds with ordinary principles of federalism.
Mootness is concerned with the realities of the litigation under examination, and its existence must necessarily turn upon the individual facts of each case. Considering mootness in the traditional, constitutional sense of whether a viable case or controversy remains, we are not convinced that the controversy here “no longer ‘touch[es] the legal relations of parties having adverse legal interests.’ ” DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706 (1974) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-464, 81 L.Ed. 617 (1937)).
The State of Ohio was and is entitled to a legal determination that the act of the bankruptcy judge in ordering payment of the money was unlawful under Edelman v. Jordan. That issue may have consequences in the further administration of the estate and in Ohio’s ultimate right to obtain, if it can, a disgorgement of the monies so paid. As we have discussed more fully in Section I of this opinion, the debtor-in-possession and the bankruptcy judge considered the monies due as specific funds subject to the summary jurisdiction of the court. Although a turnover may properly be used to compel the delivery of property of the bankrupt estate, such concepts do not appropriately extend to the monies which were sought here, and the action of the bankruptcy court can only be deemed in the nature of a judgment for monies claimed due the debtor-in-possession under a contract with Ohio.
Therefore, we rely upon the general rule regarding mootness, as set forth in Dakota County v. Glidden, 113 U.S. 222, 224, 5 S.Ct. 428, 429, 28 L.Ed. 981 (1885), and more recently reaffirmed in Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972):
There can be no question that a debtor against whom a judgment for money is recovered may pay that judgment and bring a writ of error to reverse it, and if reversed can recover back his money. And a defendant in an action of ejectment may bring a writ of error, and failing to give a supersedeas bond, may submit to the judgment by giving possession of the land, which he can recover if he reverses the judgment by means of a writ of restitution. In both these cases the defendant has merely submitted to perform the judgment of the court, and has not thereby lost his right to seek a reversal of that judgment by writ of error or appeal.
Dakota County v. Glidden, supra, 113 U.S. at 224, 5 S.Ct. at 429, quoted in Mancusi v. Stubbs, supra, 408 U.S. at 207, 92 S.Ct. at 2310.
Collins has not borne his burden of showing that the outcome of this appeal could not affect the legal interests of the parties. In this respect, we agree with the Tenth Circuit in In Re: King Resources, 651 F.2d 1326 (10th Cir.1980), which held that an appeal from an order confirming a plan of reorganization under Chapter X was not moot merely because the appellant had *464 failed to obtain a stay of the order approving the plan. The Tenth Circuit observed:
[We] cannot say that a decision that the plan was erroneously confirmed could not have some affect on the proceedings below, even if it could not undo all that has taken place.... Nor are we persuaded on our record that appellees’ claims of substantial consummation are clearly established. Before refusing to consider these appeals on the merits because of consummation which has occurred, some hearing and development of a record would be required, with more delay.
651 F.2d at 1332 (footnote omitted). Likewise, here, we are unable to say that the impact of the bankruptcy court orders if allowed to remain unchallenged (which would be the effect of a dismissal of the appeal for mootness) would not have some important bearing upon the parties. We do not know at this point how Ohio may, in a practical way, get its money back, nor are we asked to decide the relative priorities that Ohio might enjoy in pursuing such an effort. It is enough for us to hold here that the turnover orders were unlawful under the Eleventh Amendment; Ohio’s rights in the further administration of the bankrupt’s estate or in an attempt to recover the funds ought not to be impaired by any claim that the bankruptcy court’s turnover orders are valid or have any res judicata effect.[12]
III.
In conclusion, we have held that the turnover orders, so styled, were invalid under the Eleventh Amendment and that they are vacated and can be held of no effect. We have likewise held that the fact that Ohio may have honored those orders by paying monies demanded to the trustee did not render its claim moot. While we have indicated our tentative view that the employment of a vehicle of a turnover order to obtain enforcement of a debt was inappropriate, our findings concerning the merits of the underlying claim are not otherwise intended to be binding in any litigation which may be properly brought in a court of proper jurisdiction between the bankrupt estate and the State of Ohio. It was improper for the bankruptcy court in all events to have reached that issue, and neither need we. Our determination in this regard is intended merely to aid in the analysis of the Eleventh Amendment and mootness issues. We do not suggest what further proceedings, if any, may properly be taken by the parties hereafter. In its original and reply briefs, Ohio does not specify any relief sought other than a reversal of the orders appealed from, and, accordingly, we grant none other, leaving those further procedures to abide the event.
The judgment of the district court as well as the turnover orders entered by the bankruptcy court, all of which are the subject of these appeals, are vacated and reversed, and the cause remanded for further proceedings consistent herewith.
Reversed and remanded.

. The state court injunction enjoined ODPW from “either directly or indirectly or in any manner removing Medicaid patients from, and/or from refusing to reimburse [Collins] for care rendered to Medicaid recipients ... until such time as [Collins] is accorded his rights to an administrative reconsideration of the Department of Public Welfare’s decisions not to renew [Collins’] Provider Agreements.” App. 16.

. Because Collins filed before October 1, 1979, his case is conducted under the Bankruptcy Act of 1898, rather than the Bankruptcy Reform Act, 11 U.S.C. (Supp. III 1979). See Bankruptcy Reform Act of 1978, Pub.L. 95-598, § 403(a), 92 Stat. 2683.

. The requirement of a “provider agreement” was set forth at 42 U.S.C. § 1396a(a)(27) (1976): a State plan must “provide for agreements with every person or institution providing services under the State plan .... ” See also 42 C.F.R. §§ 442.10-30 (1981).

. Ohio was relying on 42 U.S.C. § 1396b(n) (Supp. II 1978) which provides:
The State agency may refuse to enter into any contract or agreement with a hospital, nursing home, or other institution ... for purposes of participation under the State plan ... if any person, who has a direct or indirect ownership or control interest of 5 percent or more in such institution ... is a person described in § 1320a-5(a) of this title [a person convicted of a criminal offense related to involvement in the Medicaid program] ....

. Under 42 U.S.C. § 1396a(a)(27) (1976), provider agreements must require each provider “(A) to keep such records as are necessary fully to disclose the extent of services provided to individuals receiving assistance under the State plan, and (B) to furnish the State agency with such information, regarding any payments claimed by such person ... as the State agency may from time to time request.” Ohio also argues that its “Medicaid Handbook” explicitly required the filing of cost reports.

. The Review Panel found that Collins’ notice was deficient under Ohio Medicaid rules because it did not notify Collins of his right to a determination hearing. The panel concluded, however, that the deficient notice was rendered moot because the Hamilton County injunction had prevented termination without notice and hearing. See App. at 21. Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266 (3d Cir.1978) (holding providers do not have due process right to pretermination hearing).

. The panel found that Collins’ filing of inflated cost reports established good cause for his termination. See App. at 19. Collins does not contend that this violates the good cause standard set forth at 42 C.F.R. § 442.12(d)(1) (1981).

. The August order was directed at “Thomas E. Ferguson, Auditor of the State of Ohio, and/or Patrick Kerrigan, Esq. of the Office of the Attorney General,” and the September order required “personalities” of the State of Ohio to turn over the funds.

. Because we find that the orders require retroactive payments from the state treasury and, hence, are inconsistent with Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), we do not reach another limitation of the Ex parte Young doctrine that could be relevant in the present case. In Florida Dep’t of State v. Treasure Salvors, Inc.,-U.S.-, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), the plurality opinion interpreted Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), to require that an action against a state official must be “based on a theory that the officer acted beyond the scope of his statutory authority or, if within that authority, that such authority is unconstitutional” in order to avoid the bar of the Eleventh Amendment. Florida Dep’t of State v. Treasure Salvors, Inc., supra,- U.S. at-, 102 S.Ct. at 3317. Although disagreeing in their application of Larson, the dissenters in Treasure Salvors agreed with the plurality as to the holding of Larson. Thus, it would not have been sufficient for Collins to allege merely that Ohio officials committed a tort or breached a contract in refusing to make the Medicaid payments. Although not deciding this question, we do note that the bankruptcy judge never found that Ohio officials had acted ultra vires or unconstitutionally as required by Florida Dep’t of State.
In section I of this opinion, we found that the proper inquiry had not been made by the bankruptcy court for use of a turnover order under summary jurisdiction and expressed strong doubts that such a procedure could be appropriate under the present circumstances. Therefore, we have not analyzed the Eleventh Amendment issue as one where a proper turnover order was entered against a state holding property of the bankruptcy estate. We only note that that issue has produced varied results. Compare In re Reiber’s Inn of Westchester, Inc., 3 B.R. 706 (Bkrtcy.S.D.N.Y.1980) (turnover order against seized unemployment contributions was not an affirmative award against state treasury) with In re Crum, 20 B.R. 160, mem. op. and order (Bkrtcy.Idaho 1982) (turnover order against money withheld by state for taxes, penalties and interest would violate Eleventh Amendment). Cf. Florida Dep’t of State v. Treasure Salvors, Inc., supra (in rem admiralty action against the state, where state did not have colorable claim to the property, was not inconsistent with Edelman v. Jordan).

. Collins cites In re Crisp, 521 F.2d 172 (2d Cir.1975), for the proposition that filing a proof of claim waives all sovereign immunity. In that case, however, the court only held that filing the proof of claim acted as a waiver of sovereign immunity as to the discharge of the debt by the bankrupt. The court did not discuss waiver of the Eleventh Amendment for affirmative relief against the state.

. Rule 805 provides:
Stay Pending Appeal
A motion for a stay of the judgment or order of a referee, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be made in the first instance to the referee. Notwithstanding Rule 762 but subject to the power of the district court reserved hereinafter, the referee may suspend or order the continuation of proceedings or make any other appropriate order during the pendency of an appeal upon such terms as will protect the rights of all parties in interest. A motion for such relief, or for modification or termination of relief granted by the referee, may be made to the district court, but the motion shall show why the relief, modification, or termination was not obtained from the referee. The district court may condition the relief it grants under this rule upon the filing of a bond or other appropriate security with the referee. A trustee or receiver may be required to give a supersede-as bond or other appropriate security in order to obtain a stay when taking an appeal. Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser or holder knows of the pendency of the appeal.

. The order of September 18 did not merely call for the immediate payment of money but, in fact, especially provided that Ohio must continue to make payments in the future even though no provider agreements existed and even though it had given every indication of its intention not to do so. The record suggests that events have occurred which might make the further enforcement of this order unlikely. Were the sole reason for our decision the likelihood that the orders would be enforced in the future, we would be inclined to remand to the district court for further proceedings to determine the existence of mootness on this basis. See, e.g., North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (per curiam) (remanding for further facts concerning mootness). We do not, however, address our mootness ruling solely upon this circumstance or upon any assertion that the wrongs complained of are “capable of repetition, yet evading review.” Southern Pacific Terminal v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).